This morning, the first is number 22, 1386, Roku, Inc. v. ITC. Mr. Hallward, to remind you. Thank you, Judge Dyke. May it please the Court. We have three issues on appeal, and I'd like to address all three, so I'll try to be efficient. Probably best to start with the two-threshold questions of standing in domestic industry. Before you begin, I think the brief's mark is confidential, the assignment language, and the 2004 and 2012 assignments. I mean, that really seems not appropriate. I apologize, Your Honor, if we have over-designated. I know we complied with the limits of words to mark as confidential, but I apologize. Is there any reason why the assignment language should be confidential? Not on our side, Your Honor. I mean, aren't the assignments usually provided to the PTO and of public record, right? It's not an issue on our side, Your Honor. So, I'm hearing no objection from... Okay, well, we'll treat it as not confidential. Okay.  Thank you, Your Honor. With respect to standing, the ALJ made only one finding of fact with respect to the trial record, and that was with respect to Mr. Barnett's understanding of his 2004 employment agreement, which language used there was that UEI shall own, which this court has held in omnimed sci, does not reflect a present assignment, but rather an intent to assign in the future. So, that was not enough. UEI recognized that that was the basis of the holding of the ALJ in its brief to the commission. But my understanding is nobody's much relying on that anymore. Now, on appeal, the commission is saying that the ALJ based its decision on the 2012 assignment. But that's not so. Although the ALJ did... The truth is it's quite confusing as to what the ITC did. It does seem to rely on 2004. What we know with respect to 2012 is that all the ALJ did is note the commission's own decision reversing summary judgment in Roku's favor. But the ALJ, and this is on page 140 of the appendix, recognized that in that earlier interlocutory appeal, the commission had not purported to resolve as a matter of law whether UEI had satisfied its burden to show standing. Why isn't the 2012 assignment sufficient? Well, your honor, what the 2012 assignment does, and this is language that is quoted on page 140 of the appendix in the ALJ's decision, is assign Mr. Barnett's interest in the priority applications. But it is a question of fact... It actually assigns his interest in the invention. In the invention, in the priority applications. But the question is whether the 196 patent is the same invention. And that is an issue that Roku contested. And it contested at trial, including through... Can I interrupt you for a minute? You're saying keep on referring to priority applications. But do I remember correctly that the exact language is divisionals, continuations, maybe not continuation in part, but it does say continuation. Yes, it does say continuations, but not continuations in part. And continuations in part differ from continuations specifically because they may include additional material, a different invention. To which this person, Barnett, did not contribute, right? Well, that is a question of fact, your honor, and it depends upon whether the invention in the 196... I thought it was accepted that he didn't contribute. What's that, your honor? I thought it was accepted that he didn't contribute. No, your honor, that was his testimony in an affidavit. But at trial, they did not put on any additional testimony from Mr. Barnett on that fact. He instead testified with respect to the 2004 agreement, not the 2012 assignment. So there was no additional testimony at trial on this. There may not be additional testimony, but the record's undisputed that he didn't contribute. Well, your honor, that's not... Is that not true? Well, your honor, it's not clear that the invention in the 196 claimed by the 196 patent is the same invention that he assigned. These are questions of fact. It may be that the ALJ... I mean, the record's undisputed that he didn't contribute. Well, your honor, we do contest that what is claimed in the 196 is the same invention that Mr. Barnett reported to assign in 2012. But at base, our objection is that that is a finding that has to be made in the first instance by the ALJ or the commission. They have not made it. The ALJ simply refers back to the commission's interlocutory appeal ruling, which the commission recognized was just on the basis of the summary judgment record. It can't be a ruling on the basis of the trial record, which doesn't exist yet. And the ALJ does not make independent findings with respect to the trial record on that point, as he would have to. As this court may be aware, the Supreme Court has addressed this in the case of Ortiz v. Jordan, which is at 562 U.S. 180, which it said that after trial, we don't review summary judgment determinations.  The findings of fact have to be made on the basis of that record, not the summary judgment record. But there have not been factual findings by the commission or the ALJ, whose findings the commission adopted on the trial record with respect to the 2012 assignment. In the absence of such findings- Did you ever dispute before the ALJ that this guy was not the inventor of the new matter and the continuation of the bargain? Well, we said that it was their burden to establish and that he would have to present testimony on that. There was no additional testimony at the trial on that. Where did you say that? What's that? Where did you say that? We said that in our opposition to their motion in limine. They moved for in limine- Is that in the appendix? It is in the appendix. Where? Oh, actually, Your Honor, I'm sorry. That is not in the appendix. There is a reference in the appendix, and this is at 27366. This is on appeal to the commission where Roku cites that it had contested whether the 196 is the same invention that Mr. Barnett assigned and points to, for example, its cross-examination of UEI's expert, Mr. Rosenberg, on this. And the fact that Mr. Rosenberg was not able to provide any detail, he ultimately concluded that he had not opined that it was the same invention. So there were disputes of fact that had to be resolved by the ALJ or the commission. I don't understand what the dispute of fact is. Point to me where you said there was a dispute of fact as to whether Barnett was the inventor of the new matter. Your Honor, I would point to the appendix 27366, which is where, on our appeal to the commission, we said that there were disputes as to these issues. Where does it say there's a dispute on this issue? I'm sorry, Your Honor, I have to point that up. Where we say UEI failed to carry its burden of standing here because it did not show that the invention, the priority applications, is the same as that of the 196 patent. We note that the assignment assigns only continuations, not continuations in part. Where does it say there's a dispute as to whether Barnett contributed to the new matter? Well, Your Honor, that would be part of the questions that UEI bore the burden of. And it had the burden to establish, and the ALJ had to make that finding. The ALJ did not make that finding. So I think, I do want to make sure I get to the other issues. But there's no, he has an affidavit. There's no evidence from your side specifically confronting his affidavit. You're just relying on the burden of proof. That's right, Your Honor. So the undisputed fact in the record, even if the ALJ didn't find it, is that he didn't contribute to the new matter. Well, Your Honor, I think that that would depend on whether it's the same invention. They're saying it's the same invention. If it's not the same invention, then we would have the question, well, who contributed that additional material? So I think that... Why does that matter? He said even if there is new stuff, he didn't do it. Well, Your Honor, he said that he did not contribute the blue language that had been added to the specification. That's what he said he hadn't. Is that enough? If it's not a new invention, he assigned, right? If it is not a new invention, then he assigned. And if it is new, he said in his affidavit that he didn't contribute. He said specifically he had not contributed to the blue matter, which was the additional language in the spec. Whether that's the same question or not, I think is one that the ALJ had to resolve as a question of fact, Your Honor. So without a finding by the ALJ or by the commission, there's nothing for this court to review. We have nothing to point to and take issue with. And as a matter of agency practice, it has to be done in the first instance by the ALJ or commission. I do want to address the other issues, Your Honor. With respect to domestic industry, there is no dispute that the commission did not require that UEI prove either that its investment in development of the patent actually related to the Samsung televisions. Why does it have to do that? Its product in the patent doesn't cover the Samsung televisions. It covers the, it's called, what, Kwikset. No, Your Honor. Kwikset does not itself practice the patents. That's not disputed. Kwikset is used in practicing the patents. But they didn't invent the TV. I find this argument completely wrong. I mean, they're not trying to say they invented all the technology in the TV. They're trying to say they invented Kwikset, which as implemented by the TV, covers the patents. Well, it is part of practicing the patents in the televisions, but they don't even show that their investment in Kwikset all relates to the domestic industry articles, which are the Samsung TVs. They acknowledge that Kwikset is used in Sony and other televisions and other devices, but that's not protected under 337. It's your view, I take it, that any time somebody contributes to part of a product that's sold and the scope of the claim covers the product sold, that at that point there always has to be some kind of allocation for the economic problem? And what case law, if any, do you have to support? Well, Your Honor, we cite InterDigital for this, that the investment has to be, one, quantitative, and, two, it has to be with respect to the protected articles. But InterDigital doesn't talk about allocation. Our case talks about the need to allocate the intellectual property. The commission itself has recognized the need to allocate. None of our decisions? Well, they do speak about allocation in InterDigital, and we believe that the language with respect to the protected article needs allocation, and the commission acknowledges this on page 44 if we're talking, for example, about a plant. This is just to make sure. You've got two arguments, as I understand it. One of them is that there has to be allocation in terms of showing that the Kwikset was significant compared to the other expenditures made for Samsung TV. That's the second of the two arguments. Is that the one you're talking about? Which one are you talking about now? Right now I'm talking about the first, allocation. Kwikset, it's investment. They both sound like allocation. So the first argument is that their investment in Kwikset does not exclusively relate to Samsung. In other words, they have to show that their investment specifically for Samsung compared to, like, other TVs or products. Samsung or other articles that practice the patent, not to things that don't practice the patent. On their view, as long as there was one in a thousand uses of Kwikset that practices the patent, if that's all that the Samsung televisions represented of applications or uses of Kwikset, that would be enough. But they have acknowledged, if you're talking about a plant where both protected articles and non-protected articles are made. That's different. That's under B, right? Well, but this court in InterDigital and again in LELO indicated that the analysis is the same for A, B, or C. With respect to the protected articles language is in the preface. It's the language that precedes A, B, or C. And so it would apply equally to A, B, and C. And that is what the court says in InterDigital. InterDigital makes it clear that it has to relate. The intellectual property has to relate to the protected articles. But why does it follow from that that you have to allocate? What's the purpose of the allocation? The allocation is to make sure you're not counting investments that were made with respect to unprotected articles, as in the plant or here, if the Kwikset had been developed. In terms of substantiality or what? And then in substantiality, what the court said in LELO is that it must be, the complainant's total amount of investment must be significant relative to its overall investment with respect to the articles at issue. In other words, if the complainant was actually making the televisions outside of the United States, but it made some little component in the United States that was in exploitation of the patent, it would have to show that its investment in the component in the United States domestically was significant with respect to the value of the articles. That's what LELO says. And it is the same whether it's UEI producing the televisions or someone else. See, my time is almost running out. I do want to say something about the- Can I answer about LELO? I mean, I'm sorry. I know you're running out of time. But isn't LELO really answering, it says in the case itself, it's addressing the sole question of whether qualitative evidence can satisfy the economic problem. And they held that it has to be quantitative, but in the process of doing so- In the process of doing so, it explains what is meant by significant or substantial. It treats those two the same and says that it has to be with respect to the articles. With respect to obviousness, Your Honors, I want just quickly to say that at Appendix 30, which is the commission's analysis on this, it's like a law school exam in how to misapply patent law. On Appendix 30, they say that they overturned the ALJ. The ALJ found that it would be obvious, the invention would be obvious, in the combination of Chardon and Mishra. And the commission overturned that. On 30 of the appendix is its analysis. It says, Roku identifies no teaching, suggestion, or motivation in Chardon or Mishra to divide control. They're insisting that we identify the teaching, motivation, or suggestion in the references. KSR says, that's not how you do it. They say that doing so would run contrary to Chardon's teaching, as though that's a teaching away. When In re Fulton says, no, there must actually be criticism or some denigration of the patented technology. And then it says that combining the two would be wasteful or duplicative by adding a second IR pathway. But that's not true, because that presumes, contrary to this court's holding in Re Moutet, that you just corporally combine the two, rather than, as was proposed, to substitute Mishra's IR pathway for Chardon's. It's important to understand how close Chardon comes to this invention. Chardon has two pathways. It has an HDMI pathway, it has an IR pathway, and it chooses which one based upon which devices they teach. But it's not referring you to another device for the IR. That's right, Your Honor. That's the part that Chardon doesn't do. The IR blaster is incorporated in the set-top box. But we rely on Mishra to translate the IR command through the remote control. Chardon does have a remote control. In fact, Chardon is called a remote control system. So it's not as though remote controls are foreign to Chardon. It's just that, as Your Honor said, it doesn't relay the IR command through the remote control. What was your evidence that would be a motivation to modify Chardon to look to a separate device? Well, we explained that the IR blaster... Forget about explain. Was there testimony? There was, Your Honor, and I don't have the citation to it. The testimony was that the IR blaster being contained in the set-top box, which would be... Was less desirable. Because if you put it in an entertainment unit, for example, it could be blocked. Whereas having it in the remote, where you're pointing it at the device, that's more useful. And so that was the motivation combined. The analysis of the commission on that is wrong, too, because they say, well, we didn't show that that would have been the preferred. We don't have to show what would be the preferred. There were other ways to solve, they said. We don't have to exclude other ways to solve. Okay, I think we're out of time.  We'll give you two minutes for rebuttal. Thank you. Okay? Good morning. May it please the Court, I'd like to start with a standing issue. You're Mr. Stevens, is that right? Carl Brecher for the IT Center. Brecher, okay. Sorry. First point is that we heard a lot this morning about the 2012 assignments, Mr. Barnett's contributions before and after the, what we call the priority applications. None of that was in Roku's opening brief, so we never had a chance to respond to any of this. And we think all those arguments have been waived for purposes of this appeal. Well, not if the ALJ's decision was based on the 2004 assignment. But it wasn't. What? But it wasn't. I'm not sure you're right about that. I'm sorry, Your Honor. The ALJ relied on testimony that he had it from the beginning of his employment, which was 2004. It's just that the commission doesn't deserve high marks for clarity here. What it was doing is unclear. So at least I'm inclined not to fault them for addressing 2004 initially. The question is, you know, does the 2012 do it? Well, respectfully, Your Honor, I have to disagree because we have to bear in mind that You can disagree, but let's talk about whether the 2012 assignment is sufficient. It is, Your Honor, because, first of all, the ID expressly refers to the 2012 assignment and the commission's findings with respect to that assignment. It says there's nothing in the record from Barnett or from Roku that would upset the commission's findings with respect to the 2012 assignment. It's not addressing the merits of the 2012 assignment. That was my question. The 2012 assignment doesn't mention continuations in part. So why does that confer standing? First of all, it's not relevant because the testimony from Mr. Barnett was You keep saying that, but I didn't ask you about that. I'm asking you to address the merits of the 2012 assignment. The assignment is broadly written. It covers expressly cons, divisionals, there's applications. And we looked at the case law and we found, well, I should back up. Roku was saying cons have to be limited strictly to con and can include continuations in part. We looked at their case law and we looked at cases from this court, and there have been cases where cons in the sense of an assignment like this, a broad assignment, have been interpreted to cover CIPs. And there's nothing in these assignments. Which case? University of New Mexico you're talking about? New Mexico, and there's others that were cited in the commission's opinion. But the New Mexico case had other language. And our point was that there have been cases where con is construed more broadly. And there's no evidence or record of why they were limiting Mr. Barnett just to his cons and not his CIPs when this was a standard assignment. There's been no evidence, no testimony of why they would do that. I mean, a CIP is a standard reference. And what's more in the commission's opinion. I think there's a good reason that continuations and continuations in part would be different in terms of an assignment by an employee who might invent something later, which was the new matter in the continuation in part assignment. And that would be a good reason not to cover that with a general assignment in the first place without knowing what's coming in the future. So what about the argument that Barnett didn't invent anything that was in the new matter? Well, as the commission pointed out in its earlier decisions, the ID points out, Mr. Barnett contributed in what were called the priority applications. These were two provisionals in the original utility application in the chain that eventually led to 196. He contributed to that material, but there's never been any evidence that he contributed any inventive material after that. And even today, there's no... How does the record show that he didn't contribute to the material after that? He contributed on the first three applications, but there's nothing saying he contributed anything after that. He didn't say that. The question is, does the record establish he didn't contribute? Yes, it does. There's a declaration from him to that effect. And I also just want to note that when the commission reviews an ID, it steps into the shoes of the ALJ. It's making decisions as if it were making the initial decisions. So there were legal findings with respect to the assignments. The only reason the commission didn't go to the final question standing was because that wasn't a question before. It didn't have a complete record. So it took these legal findings, sent them back to the ALJ. The ALJ expressly referred to these legal findings in his analysis and said, there's no testimony here, there's nothing from Roku, nothing to upset the commission's understanding of the operation of these assignments. And so therefore, there was standing. I want to move then to the economic prong analysis. Roku's been using the word allocation to refer to the concept that UEI has to compare its own expenses to the final cost of the product. That's never been a legal requirement. There's no case from this court that's imposed such a requirement. In fact, what InterDigital... Because I understand what they're saying on their first argument about allocation is that you've got to allocate the costs of the intellectual property to a particular product covered by the patent and to show that it was significant for that product, right? Well, what the... Is that not one of their arguments? They may be arguing that, but what the statute says is UEI has to show a substantial investment, in this case domestic investment, in the patent's exploitation, meaning research, development, improvements, and such. So the substantial investment goes to the R&D. The R&D, in turn, has to be with respect to the articles protected by the patent. That's exactly what UEI did here. They allocated their expenses in the sense that they identified those research and development activities relating to development of Kwikset, which is necessary for the TVs to practice this invention. They identified projects that are uniquely for integrating that software into Samsung TVs. And then they separated out all the other research projects for other companies, other TVs, other products that weren't relevant. So they did the allocation. So it's your view that that was enough to show substantial? I mean, in the question of whether it's a substantial investment, is that a question of fact? Well, the first part of your question, Your Honor, was is that substantial? That's just the first step. This is the allocation. I understand. I think the argument is that allocation has to be used in order to be able to show that something's substantial, that it was a substantial investment. And you're showing that some allocation, you're telling us about what was presented so that the ALJ and the Commission could see, could determine whether it was substantial investment or not, right? Right. They went from the allocation to the substantiality. And as I was going to mention, they did show that those investments, the allocations are. I just want to make sure I understand what you're arguing. I mean, it's very clear to me. But I think you're arguing that that framework that they used was sufficient for showing that there was a substantial investment. Yes, it was. Allocation is the first step. Substantiality is the second step. And in this case, UEI showed. So the idea is that if you show that the investment in intellectual property is substantial, you don't have to show that the incorporation of that intellectual property in the product is substantial. It's substantial in a qualitative sense here, and that's essential to make the Samsung TVs practice the invention. But there's not a financial, mathematical requirement that you compare UEI's cost to the cost of the final product. That's never been a wholly. So hypothetically, let's say they've shown that all of their R&D is related to creating this software. And so they've shown that they've invested substantially in that software, and the software, as implemented in the TV, practices the patent. But what if that software is only licensed at 50 cents a TV, and the TV costs $1,000? Is that substantial under the meaning of the statute? Because all of their investment, they've shown they've substantially invested in the piece of the software, but the software itself is not a substantial part of the cost of the TV. Do they have to show somehow that the software is a substantial part of the TV's cost? On a cost-for-cost basis, no. But I would just clarify that there's a certain level of effort in research and development that has to go on before you can even get to the point of licensing it. And they've shown they've invested in the software, they've improved it, they've integrated it. Sure. I mean, my hypothetical, I think, if I didn't make it clearly, the premise was they've met that first part. They've invented something, and they've spent a lot of R&D to invent something that, once it's incorporated into the TV, practices the patent. But the software itself, let me make it a little bit more refined. Once it's incorporated into the TV, it's all these other physical components of the TV that practice the patent in combination with their software. All of their investment is in the software itself. They didn't create the TV, they didn't create any of the hardware outlets, the sensors, the remotes, or anything like that. But do they have to show somehow that still their software is a substantial part of the TV, or just that their investment in the software as implemented in the TV is substantial? I know that's a little hard to follow. If we're just looking at the cost of downloading the software onto a TV, that's not a big cost, but that's the magic of software, is that once you've developed it, you can put it on one TV, a million, it's not going to cost that much. I think we need to remind ourselves this is sub-prong C, which goes specifically to research and development. This aspect was added to 337 specifically to allow research-intensive companies or universities to potentially come before the commission. They're not making products in an interdigital, for example, it doesn't require the complainant to make. That's not true, but that doesn't really answer the question that Judge Hughes is asking about, and that is does the investment in the intellectual property need to be allocated to the product so that it's substantial once it's allocated to the product rather than substantial as a whole before allocation? It's substantial in that it makes the TVs practice the invention, but if we're looking just at a licensing cost, this court's not required that kind of financial analysis, that kind of financial comparison. But it doesn't require it one way or the other. It doesn't address the question, right? Well, it has in, say, interdigital. In that case, the complainant was licensing software to develop certain software that went into certain standards, and it was all based on licensing. They weren't making a product. Interdigital didn't address the allocation question, right? Well, it didn't require it either, and what we seem to be saying here is there has to be a requirement. Well, there's never been that requirement. Substantiality has a quantitative aspect, which UEI has shown, and it has a qualitative aspect, and it's qualitatively important that it makes the TVs operate, perform the patent. It's quantitatively significant in this context because they've shown that their research accounts for about two-thirds of their global R&D in QuickSet and implementing it in the Samsung TVs. That's the kind of analysis the court has accepted in the past. So is the sum of your answer is they have to show a quantitative investment in the invention they made, the software, and that they contributed substantially to the R&D, but then they only have to show that qualitatively it's important to the overall product? In this case, yes, and that's been true in other cases too. I mean, there have been other cases where companies like Microsoft write operating systems for cell phones. The operating system itself, loading it on the phone, may not be that expensive, but it is still an acceptable model. In the Microsoft case, there were other problems with the cell phone itself and whether they practiced the invention, but that was an issue here. I'm sorry. I see that I'm out of time. Well, before you sit down, just address briefly the question of obviousness. It seems to me that they're contending that the commission said some things about obviousness which aren't consistent with our case law. Well, they're frankly wrong because what the commission was doing and what it was required to do is apply a gram-type analysis to look at the scope and the content of prior art, compare the prior art to the invention, take into consideration the objective and DCA. So what counsel was describing are factual findings about prior art. They're not local requirements. Wait, wait, wait. They're talking about specific things that the commission said that seem not to be right. For example, that there isn't any suggestion in Chardon or Mishra to combine them, which is not an accurate statement of our law. In fact, that's what led to KSR. But we weren't summarizing the law. We were making factual findings on what the prior art said and what it didn't say. What the commission concluded is that there's a gap in the prima facie showing, and that's why the objective and DCA are so important. It showed that to persons skilled in the art and knowledgeable of the art, you know, this little gap was important, and we have these two references that are explaining the invention, the long-felt need in the industry of praise and so forth. And those references are directed specifically to this invention as it practiced in the very TVs that were at issue here, the Samsung TVs. So, no, we're not making legal requirements that defy KSR. We're making factual findings on the prior art, and those factual findings, whatnot, are even admitted in Roku's brief. Chardon doesn't disclose certain things. Mishra doesn't disclose certain things. That's significant. It's not the end game. It's not the end of it, but it's significant. Okay. I think we're out of time. Thank you, Your Honor. Mr. Stevens. May it please the Court. Thank you, Your Honor. To discuss that point first, when the commission mentioned the fact that there was no explicit teaching in the two references, that was in direct response to an argument that Roku had made in the underlying proceeding. The commission then continued to analyze other arguments that they made regarding motivation to combine that went beyond the patents and did not credit the position that they were taking. So it was not based upon ñ it did not run afoul of KSR. That was in response to an argument they made, and they went further and analyzed the facts. Going back to domestic industry, Judge Stoll, to answer your question, I do believe that substantiality is directly a question of fact that should be reviewed for substantial evidence. And, Judge Hughes, to answer your question, the statute itself in subsection C talks about substantial investment in its exploitation, and the its there has been held to refer to the intellectual property right, the patent. So what the substantiality test is, is are the investments here that UEI made, are those substantial in the context of its investment in this technology? So if they only spent, you know, $1,000 in R&D because it didn't take them long to do the software, then maybe that's not substantial, but whatever the 7, 8 million or whatever is in the record, in your view, is. Yeah, that's generally right. If they spent $1,000 in a multi-million dollar company, that might not be substantial, and that might not meet the test here. Here the evidence is the total spend was over $17 million, 17.8 I believe, in the time frame that we were looking at. And over that same. They're not contesting that that's substantial. They're saying you've got to allocate that to the product and show that it's substantial in the particular product, right? That is their argument, and I disagree that the law requires that for subsection C. I think that's inconsistent with interdigital. But as the commission pointed out, we did do an allocation. We made sure to take out any investments made in Kwikset that weren't directly one-to-one to support something that went in the Samsung televisions. So, for example, if some other customer had said, hey, we'd like Kwikset to have this special bespoke feature just for us, we took that out. We did not count that as part of the investments. We only looked at things that were necessary to implement for Samsung, and there's undisputed testimony in the record that every dollar that we allocated went directly to that effort. That's another factual finding that's not really been challenged here. So I'd like to... Factual finding by whom? Factual finding by whom? You said that there's a finding about allocation. Who made the finding? So the judge did. ALJ? That's correct, Your Honor. Where did the ALJ make that finding? So on pages... The ALJ is discussing the economic prong on pages APPX 175 all the way through about 181 or 182. In there, he talks about Mr. Barnett's testimony that... Where does he make a finding about allocation? For example, on page APPX 177, near the middle of the page, the ALJ finds, quote, Mr. Barnett explained that these projects involve the integration of QuickSET implementations on the Samsung products. Going earlier in the paragraph, in addition to the investments in the QuickSET platform, UEI states that it invests in R&D projects, quote, dedicated to implementing and integrating QuickSET on the Samsung DI products specifically, and then go on from there. So the testimony that we offered at trial was that we had excluded anything that didn't relate to providing this in a way that Samsung implemented it. I believe that the judges... I don't see that the ALJ made a specific finding about allocation. It recites your testimony. Well, sure. On the page beforehand, he goes through the actual dollars and says, you know, this is for Samsung DI products. You know, on appendix page 176. Both the QuickSET SDK and cloud are necessary for Samsung's implementation and use of QuickSET and the Samsung DI products. So I do believe the testimony supports the notion that every dollar was allocated to projects necessary for Samsung. I believe the ALJ agreed with that. And the commission, of course, affirmed the subsection C finding. It doesn't mean that the intellectual property couldn't also be used in other products which aren't covered by the PAC. It doesn't mean that. But every dollar that we included within our math, every dollar was necessary in order for that QuickSET to be on a Samsung TV, in order for it to work. But maybe that same intellectual property was used in other products which aren't covered by the PAC. That's the argument. Well, sure. If there's intellectual property that was used in other ways, perhaps there would have been other money that we could have allocated. So I'm not sure I understand that part of your question. Can I ask you a question? Yes, ma'am. I think the argument is do you contest the legal framework that your adversary is suggesting? That is that you have to show that, you know, of the $17 million or whatever it was that was provided, this much you would allocate to Samsung or this much you would allocate to some other customer or some other use of QuickSET. Is that a requirement under law? I don't believe that's a requirement under law. I think this court's case in interdigital and the ITC's precedent about subsection C does not make that a required allocation. As long as the investment is in the intellectual property, that there's a tie to articles protected by the patent, that's enough. I don't believe that there's any precedent either from this court or the ITC that we needed to exclude things. The fact that QuickSET could have been used for another customer as well. And then looking at the question of substantiality or significance of those expenditures, if you don't have allocation, why is it nonetheless significant? Well, there was an allocation. It's a policy argument. Yes, no, I understand. There was an allocation here to get rid of expenses that we didn't think were covered, and then we performed the significance test based upon the overall QuickSET R&D. So here we did precisely, I think, what you're suggesting is we looked at those dollars that were spent in order to be able to have something that would go on the Samsung TVs against the total spend of R&D. But the problem is that this same intellectual property could have been used in other products, which is the basis for their argument that there should be an allocation. And my question was in response to your suggestion that there was an allocation. I don't think that you made the kind of allocation that they say would be required. Maybe it's not necessary. That's a different question. I understand your question. Yes, they say that we should have allocated it out based upon customers, which is what we had done at the ALJ level for sub B. But that's not the same test for sub C. So your Honor is precisely correct. They're criticizing us for not doing that. We don't believe the law requires it. We believe that C is different, and the court's precedent shows that. If I could go back to the standing issue for a moment. I see my time has expired, but with your Honor's indulgence. To answer your question, there's at least two reasons why the 2012 assignment takes care of any issue in this case. The first is it didn't just say that you're assigning a patent application and any continuations. It said that it was the entire invention. There were no rights left when he signed that document. There were no rights at that point in time. But the second part that I believe has been unaddressed really is that, as you pointed out, Mr. Barnett has testified under oath in his affidavit that he didn't have anything to do with the conception of the new matter. That was all Mr. Arling's later conception. So he gave away all of his rights when he signed that 2012 agreement. The facts, I think, are not in dispute about that. And then at no point in time did he sort of collect any more of the bundle of sticks. He never got a right back because he didn't contribute to the conception of anything more. So for either of those two reasons, the 2012 agreement is rock solid and should be dispositive of this issue entirely. Okay. Thank you, Mr. Stegman. Thank you, Your Honor. Mr. Hallward to remark. You've got two minutes. Thank you, Your Honor. In InterDigital, the court said, quote, and this is at 1297 and 98, the research and development, so they're talking about Section C, must pertain to products covered by the patent. The suggestion that C is somehow different from A and B is inconsistent with the language of the statute, which sets out the requirement with respect to protected articles in the preamble that applies equally with respect to A, B, and C. C does require that the investment, research, and development be in exploitation of the patent. But that is not substituting for the requirement that it be substantial with respect to the protected articles. And this question of allocation, they point to the total amount, which is on Appendix 188, but of that amount, the vast majority is in QuickSet. Can I ask you one question? Do you think it makes a difference at all that this is software that's downloaded as opposed to a widget that's manufactured? Well, I don't think that it matters. It could in the actual facts of the case, but they haven't established those facts because they thought it wasn't necessary. Well, if you think about it, if you download software, they're going to have to make the same amount of investment regardless of how many customers you're selling to. Well, Your Honor, but what we don't know, we do know, and this is cited on the gray brief, page 15, is that this software is applicable for Sony, for Microsoft, for Xbox, all kinds of things other than the Samsung TVs. And what we don't know is was it all developed for Sony, which doesn't, as far as we know, practice the patent, and then some minor amount was invested in then tweaking it to make it applicable to Samsung? Okay, I understand your position. I understand your position. So on page 177 of the appendix, which they cite to, they're citing to discussion, and there is some Samsung-specific investment. It's the much smaller of the two numbers on app 188, and that's all they're saying with respect to Samsung. That is, in addition to investments in Kwikset, that's the much larger number, and that's the one that they failed to allocate. And Your Honor, Judge Hughes, your question is exactly the facts of this case, where the licensing fee is minuscule with respect to the value of the televisions. And I think under LELO, which says that it must be assessed in relation to investment with respect to the articles at issue, if UEI was making these televisions outside of the United States, and just this really small, minuscule thing in the United States, that would not be sufficient as substantial under the statute. I just want to say with respect to the app. So UEI didn't make the televisions. UEI made the software, right? So what if you have an American company that specializes in a very small component of software that's nonetheless revolutionary, and even though it's only a small fraction of the value of the actual product sold, it's still an important part of that product. How does that American company get protection for its patent from incorporation when most of the product's made outside the country? That's also the facts of the case. It may be that in an absolute sense it would be substantial. Here we have a licensing fee that is both in an absolute sense and a relative sense minuscule with respect to the value of the televisions. With respect to the affidavit I'm saying, I just want to say that the ALJ's rules were that affidavits did not count as testimony. It had to be live testimony. Mr. Barnett did not testify at trial with respect to the 2012 assignment. He only testified at trial. Did you ask him to? We did not cross-examine him because he hadn't offered it in live testimony. I think we're out of time. Thank you. Thank you. Thank all counsel. The case is submitted.